UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
|     PLAINTIFF, | : | CRIMINAL ACTION NO. |
| | : | 07-cr-034 (JCH) |
| v. | : | |
| | : | |
| JUAN ROMERO-CARCAMO | : | |
|     DEFENDANT. | : | MAY 22, 2009 |
| | : | |

**RULING RE: DEFENDANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL
AND RULE 33 MOTION FOR A NEW TRIAL (DOC. NO. 307)**

**I.  INTRODUCTION**

On April 15, 2009, a jury found defendant, Juan Romero-Carcamo, guilty of two counts of a superceding indictment.  Count One charged him with conspiracy to possess with intent to distribute, and to distribute, five kilograms or more of cocaine and one kilogram or more of heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(I) and (ii).  Count Two charged him with conspiracy to import into the United States from a place outside the United States 1 kilogram or more of heroin and 5 kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 952(a) and 960(b)(1)(A) and (B)(ii).  He now moves the court to set aside the jury verdict pursuant to Fed. R. Crim. P. 33 and for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c).  For the following reasons, the court denies Romero-Carcamo's Motion.

**II.  FACTS**

A superceding indictment in this case charged Romero-Carcamo and others

1

with conspiracy to possess with intent to distribute and conspiracy to import heroin and cocaine.

At trial, the government presented evidence regarding the conspiracy led by Rolando Marroquin to import and distribute cocaine and heroin. Marroquin distributed cocaine and heroin out of a house in New Milford, Connecticut. At trial, the evidence concerning the conspiracy – and Romero-Carcamo's role therein – consisted of, <u>inter alia</u>: (1) testimony from Officers Kurtz and Perez of Customs and Border Protection, and Special Agent O'Neill of Immigration and Customs Enforcement, who described the detention and interview of Romero-Carcamo after being stopped at O'Hare International Airport on a flight from Guatemala carrying two sets of tow bars packed with cocaine; (2) airline records establishing that Romero-Carcamo had traveled between Central America and the United States more than ten times between February 2005 and the date of his arrest in Chicago; (3) testimony from a co-conspirator, Rafael Caceres, who identified Romero-Carcamo as the courier from whom he retrieved drug-filled tow bars in exchange for five thousand dollars; (4) testimony from Caceres that he made these exchanges with Romero-Carcamo on two occasions: once in Miami, Florida and the other in Charlotte, North Carolina; (5) testimony of officers and agents establishing activity of cocaine and heroin distribution activity in New Milford, Connecticut; (6) testimony from officers and agents that Caceres and another co-conspirator were arrested in New Jersey after electronic surveillance in and around the target residence in New Milford; and (7) testimony of officers and agents regarding a search warrant that was executed on the target residence in New Milford, that yielded at least thirty eight sets of drug filled tow bars, including one that was partially sawed-through, similar to

the ones Romero-Carcamo was caught with in Chicago.

On April 15, 2009, a jury found Romero-Carcamo guilty of conspiracy with intent to distribute, and conspiracy to import, heroin and cocaine.

## II.     STANDARD OF REVIEW

### A.     Motion for Judgment of Acquittal

Rule 29(a) of the Federal Rules of Criminal Procedure provides that district courts "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Rules 29(b) and (c) allow a court to reserve the decision on the motion until after the jury returns a verdict.  "A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial bears a 'heavy burden.'" United States v. Hawkins, 547 F.3d 66, 70 (2d Cir. 2008) (quoting United States v. Parkes, 497 F.3d 220, 225 (2d Cir. 2007)).  In deciding whether to grant a motion pursuant to Rule 29, the court should "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." Hawkins, 547 F.3d at 70.  A jury verdict shall be sustained "so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Parkes, 497 F.3d at 225-6) (internal quotation marks omitted).  "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted).

B.     Motion to Set Aside the Verdict/For a New Trial

In the alternative, Baldwin seeks that a new trial be ordered pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Rule 33(a) allows a court to vacate "any judgment and grant a new trial if the interest of justice so requires." The rule gives the trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (internal citation omitted). The district court, when examining the entire case, must make an objective evaluation of the evidence and determine whether "'competent, satisfactory and sufficient evidence' in the trial record" supports the jury's verdict. Id. Unlike in a Rule 29 motion, where the court must draw every inference in favor of the government, in a Rule 33 motion the court is entitled to "weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)). However, it may not "wholly usurp the jury's role." Id. Although a trial court has substantially more discretion to grant a new trial under Rule 33 than it does to grant a motion for acquittal under Rule 29, the authority should be exercised "sparingly" and only in "the most extraordinary circumstances." Sanchez, 969 F.2d at 1414. "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." Ferguson, 246 F.3d at 133. A manifest injustice is found where the court has "a real concern that an innocent person may have been convicted." Parkes, 497 F.3d at 232.

### III. DISCUSSION

    A.    <u>Motion for Judgment of Acquittal</u>

Romero-Carcamo argues that the jury verdict should be set aside because there was not enough evidence to prove that he was part of the conspiracy. Specifically, he contends that all the government was able to prove was that he and Caceres had a buyer-sell relationship and that he merely sold the drugs to Caceres but did not know of Caceres' intention to resell the cocaine to others. He argues that a mere buyer-seller relationship is not enough to sustain a conspiracy conviction. The court finds that the evidence presented at trial was sufficient for a reasonable jury to conclude that Romero-Carcamo was guilty of conspiracy to possess with intent to distribute, and conspiracy to import, cocaine and heroin.

It is true that, without more, the buyer-seller relationship is insufficient to establish a conspiracy. <u>United States v. Parker</u>, 554 F.3d 230, 234 (2d Cir. 2009) (quoting <u>United States v. Gore</u>, 154 F.3d 34, 40 (2d Cir. 1998)). "Notwithstanding that a seller and a buyer agree together that they will cooperate to accomplish an illegal transfer of drugs, the objective to transfer the drugs from the seller to the buyer cannot serve as the basis for a charge of conspiracy to transfer drugs." <u>Id.</u> This buyer-seller exception "protects a buyer or transferee from the severe liabilities intended only for transferors." <u>Id.</u> at *11.

In <u>Hawkins</u>, the Second Circuit reversed a judgment of acquittal that was entered by the district court on the basis that the government had only established a buyer-seller relationship rather than participation in the alleged conspiracy. 547 F.3d 66.

More recently in Parker, the Second Circuit affirmed the convictions of the appellants who argued the buyer-seller exception should have applied to them. While recognizing that determining whether the buyer seller relationship amounted to a conspiracy is a "highly fact-specific inquiry," Hawkins, 547 F.3d at 74, the Second Circuit in Hawkins and Parker highlighted certain factors to consider. Id. These factors include, "whether there was prolonged cooperation between the parties, a level of mutual trust, standardized dealings, sales on credit ('fronting'), and the quantity of drugs involved." Id. Many of these factors, with the exception of sales on credit, were established by the government.

First, the government offered evidence that Romero-Carcamo had traveled between Central America and the United States more than ten times between February 2005 and the date of his arrest in Chicago, August 27, 2007. Moreover, Caceres indicated that he made transactions with Romero-Carcamo on two occasions. It can be inferred from Romero-Carcamo's frequent travels over a span of two years and Caceres' testimony that he made transactions with the defendant on two occasions that there was a prolonged cooperation between Romero- Carcamo and at least Caceres, who was one of the co-conspirators.

Further, the dealings were standardized. Caceres testified that he would often travel to Charlotte and Miami to meet people, like Romero-Carcamo, to pick up tow bars. He testified that people would usually come with two tow bars at a time, and the drugs were always packed in the tow bars the same way. He further testified that he would exchange two tow bars for five thousand dollars. Caceres also indicated that each person delivering the tow bars knew to say, when asked, that they were in the

United States to pick up cars and take them back to Guatemala. Indeed Agent O'Neill testified that Romero-Carcamo indicated to him that he planned on buying a car in the United States and driving it back to El Salvador towing another car.

Further, the quantity of drugs involved was significant and certainly is a strong factor in establishing that Romero-Carcamo had knowledge that the cocaine was being resold. Indeed, "[a] large transaction or an accumulation of deals suggests more trust, garnered over a period of time, as well as a greater likelihood that the parties have 'put their heads together' to figure out planning, organization, and ways to conceal their activities." Hawkins, 547 F.3d at 77 (quoting United States v. Gibbs, 190 F.3d 188, 199 (2d Cir. 1999)). There is no doubt that Romero-Carcamo was caught carrying a large amount of cocaine and that the transactions he made with Caceres were very large. Agent O'Neill testified that the tow bars weighed about thirty pounds and were about five and half feet long. Each tow bar Romero-Carcamo exchanged with Caceres was packed solid with powder cocaine. The drug quantities established by the government in this case demonstrate that this was more than a buyer-seller relationship and Romero-Carcamo knew of the conspiracy. Accordingly, the drug quantity, the standardized dealings, and Romero-Carcamo's prolonged cooperation in the conspiracy is evidence sufficient for a jury to find beyond a reasonable doubt that Romero-Carcamo was not merely a seller of cocaine and that he intentionally joined the conspiracy.

Finally, Romero-Carcamo argues that there was no evidence presented at trial that Romero-Carcamo knew the tow bars contained cocaine. He states that Romero-Carcamo never acknowledged to any of the customs officers that he knew there was

cocaine in the tow bars and that Caceres stated that he delivered tow bars for two months before knowing they contained drugs. However, there is enough evidence in the record from which a jury could infer that Romero-Carcamo was lying to the customs officers and knew drugs were in the tow bars. For instance, Agent O'Neill indicated that, during his interview of Romero-Carcamo, he changed his story about where he was going with the tow bars. Specifically, O'Neill indicated that Romero-Carcamo first told him that he was bringing at least one of the tow bars to a car auction in Atlanta but later he changed his story and said he was headed to Ohio for the same reason. He also had very little information about who gave him the tow bars in Guatemala. He said he got them from a man named Jose at an unidentified gas station. Along with the tow bars, Jose gave him a round-trip ticket to Chicago and one thousand dollars in cash, but he did not know anything more about Jose. This round-trip ticket would have been unnecessary if Romero-Carcamo was going to do what he said with the tow bars: buy cars at an auction in either Atlanta or Ohio and tow them back to El Salvador. Additionally, Caceres' testimony that Romero-Carcamo sold the tow bars to him would make his story that he would be using the tow bars to tow cars back to Central America implausible. Moreover, the tow bars were very heavy which, for someone who stated he was in the car business, would likely have raised suspicion. He also received five thousand dollars, a large sum of money, in exchange for the tow bars. Thus, the fact that he changed his story when he was stopped in Chicago and it was inconsistent with Caceres' interaction with Romero-Carcamo, along with the weight of the tow bars and the amount of money he received in exchange for them, is sufficient evidence from which a jury could infer that Romero-Carcamo knew there were drugs in the tow bars.

Indeed, when viewed in the light most favorable to the government and in conjunction with other evidence in the case, a reasonable jury could conclude that the government proved beyond a reasonable doubt that Romero-Carcamo knew of the existence of the conspiracy both to import and distribute heroine and cocaine and that Romero-Carcamo intentionally joined the conspiracy.

For the foregoing reasons, the court finds that Romero-Carcamo did not meet his burden of establishing that there was insufficient evidence to sustain his conviction. The court, thus, denies Romero Carcamo's Renewed Motion for Acquittal.

### B. Motion to Set Aside the Verdict/For a New Trial

Although the court has more discretion to grant a Rule 33 motion, the court finds that there are no "extraordinary circumstances," Ferguson, 246 F.3d at 133, present in this case to warrant setting aside the jury's verdict and ordering a new trial. In examining the entire case, as it did in ruling on the Rule 29 motion, the court finds that there is sufficient evidence in the trial record to support the jury's verdict and that the jury's verdict did not result in a "manifest injustice." Therefore, the court denies Romero-Carcamo's Motion to Set Aside the Verdict.

## IV. CONCLUSION

For the foregoing reasons, Romero-Carcamo's Motion for Judgment of Acquittal under Fed. R. Crim. P. 29(c) and Motion to Set Aside the Verdict/For a New Trial under Fed. Crim. P. 33 (Doc. No. 307) is **DENIED**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 22nd day of May, 2009.


                                                    /s/ Janet C. Hall
                                         Janet C. Hall
                                         United States District Judge